Nott, J.,
delivered the opinion of the court:
This is an action brought to recover the proceeds in the Treasury of eighty bales of cotton, with interest thereon, at the rate of 6 per cent. The cotton, it is alleged, was taken possession of by a military command in Louisaua, in October, 1863, and the proceeds are averred to be $21,654 41. It’ is also alleged that the seizure of the cotton as “ abandoned property” was illegal; that the pretence of its abandonment was false;- and that the claimants are entitled to the gross proceeds, and not to be charged with the defendants’ expenses of transportation and sale.
*298 The argumeut in this ease has wandered so far from the settled principles that have guided the court in its administration of this branch of the law, ever since the leading case of Margaret Bond, (2 C. Cls. R., p. 529,) that it seems desirable to restate them.
1. The 11 Abandoned or captured property Act” was a wise and beneficent measure; defective only in not awarding to the loyal owner the interest which might accumulate upon his proceeds in the Treasury; imposing on the government a trust in favor of its loyal citizens, from which it was to reap neither compensation nor profit. “ The war was not waged for booty,” as was well said ■on the argument. But cotton 'had become a munition of war; its existence within the insurrectionary districts was a source of strength to the rebellion, and its withdrawal from the markets of the world a threatening cause of complications between the government and foreign powers. The seizure of cotton, amid the circumstances and extremities of the war, was a step toward the speedy suppression of the rebellion, and therefore, for the public good, legal and right. Whether the seizure was as abandoned property, or by capture in the enemy’s country, is immaterial; it was am act necessary for the national safety, in the judgment of the responsible head of the government, and, as such, not to be questioned in courts of law then nor now. This statute came to lessen the hardships of the military measure; to forego the acquisition of booty which the government might have claimed; to preserve for the loyal citizen all the substantial rights that equity could protect. He who seeks ■equity must do equity; he who would have the remedial benefits of the statute acknowledges and ratifies the trust.
The seizure of captured cotton under the statute cannot be held a taking of private property for public purposes within the meaning of the Constitution, for the reason that the property taken was not held for the public use, but for the private benefit of the loyal owner. He became the beneficiary, not the government. But if the seizure could be deemed to create an implied contract, within the meaning of the Constitution, the measure of damages would not be the value of the cotton after it was brought by the defendants’ efforts within the reach of the markets of the world, but the value at the time of capture, estimated by finding an equivalent for the nearly worthless ■Confederate money with which it was bought and sold. That *299 value of cotton, walled up within tbe Confederate lines, fell far ■short of the net proceeds which this trust has assured to the loyal owner.
2. With regard to loyalty and the evidence to establish it, the decisions of the court have been unequivocal and emphatic, ■and they remain unchanged. The leading case of Mcvrgaret Bond, (2 C. Ols. R., p. 529,) and the subsequent case of Oross-meyer, (4 id., p. 1,) where the subject was reconsidered and the first opinion reaffirmed, remain unquestioned by the court.
This loyalty which a claimant may seek to establish must be shown to the court both negatively and positively; that he never gave aid or comfort to the rebellion; that he has consist•ently adhered to the United States. From the nature of things, it cannot be established like the material facts wherewith courts ordinarily have to deal — the sale of a horse, the title to a farm. No two men could lead for four years, and ■amid such scenes of danger, trouble, and excitement, precisely the same life; and no two cases can come before the court on juecisely the same facts. Moreover, the life of no man, with all its hidden acts, can be wholly laid before a court, much less the untold emotions and designs and motives of the heart. Looking back upon the dark turmoil of the rebellion, and seeing only through the loop-holes opened by a few unknown witnesses, the court must separate the voluntary from the involuntary, and distinguish between the guilty design and the enforced concession. The surroundings of men also varied like their lives; some with homes trampled down by both contending armies; others, in remote and quiet neighborhoods; differently affected by age and station, and temperament, by •despondency and hope, by the dangers without and the fears within. In some situations men could evidence their loyalty by acts done for the benefit of the United States; in others they could but politically isolate themselves from the disloyal community in which they lived.
No solitary Unionist was bound to take up arms and wage a petty warfare of his own.. It were a course forbidden by the rules that govern military contests, and would have been prejudicial to the true interests of the nation. No citizen, cut off from all protection, was required to lay down life or property for his distant government, or run great risks, or endure purposeless sufferings. The nation asked for fealty, not sacrifice. Yet all *300 were solemnly, imperatively bound to do all that the circumstances of each case allowed, and in doing so did well. Perhaps the plain words of the statute are as clear as any comment can be, and are about the end of all that could be justly granted or expected: 1st. To have given no aid or comfort to the rebellion. 2d. To have consistently adhered to the United States.
And these requirements; which positive evidence could never positively establish, the law has not required to be established by absolute demonstration, but has left to be determined in the judgment of the judges, by the careful weighing of all the facts, conditions, circumstances, and motives that make up each case, and by the finer reasoning of instinctive deduction. The statute has summed up the minor qualities of this discretion in one word, by saying that the proof shall be, not absolute, not incontrovertible, not certain, but simply to the “ satisfaction” of the court.
It is therefore inevitable that from the same testimony different minds will often draw different conclusions; and that to eyes which have prejudged one side of a case there must frequently appear' great; inconsistency in the decisions of the court. It would be much easier for the court if some sure standard could be set up, or certain test applied, or fixed rule established ; but that cannot be done. Each case must stand upon its own peculiar merits, and the decision of the court follow the final belief of the judges.
But while the means for establishing loyalty have been variable and uncertain, the court has never varied as to that which was to be established. In Margaret Bond's Case, (2 C. Cls. B.,. 533,) we held that the term “aid or comfort” was not limited to such acts as would constitute treason, but that it embraced “any acts, voluntarily committed, which would tend to assist, countenance, abet, or encourage the rebellion.” In Gearing’s-Case, (3 id., 165,) we held that where the claimant “ failed in the true allegiance which he owed to his government,” he could “maintain no action of any description in this court.” In Starlc’s Case, (4 id., p. 280,) we held that the hope of gain and the fear of loss, and the intent to save property for the payment of debts due to northern citizens, did not excuse a citizen of a loyal State, remaining voluntarily in the South, and that the obligations of the merchant to his creditors -were not *301 to be weighed against those of the citizen to his country. In Bates's Case, (id., p. 569,) we held that“ to have been in opinion and sentiment loyal to the flag of his government, but to have done many things calculated to give aid or 'comfort to its enemies,” such as the claimant’s “voluntary connection with the violation of the blockade laws,” was not consistent adherence to the United States. In Grossmeyer's Case, (id., p. 1,) we held that this remedial act was not made for that class of citizens who “ endeavored to be safe whichever side might succeed that “ there was no middle ground,” and that “ neutrality was opposition.”
3. The evidence to establish loyalty the claimant must himself produce. The statute expressly throws that burden upon him. If he can show a voluntary residence during the rebellion within the loyal States, the law will not presume him to be guilty, and his choice of residence will be proof jprivia facie that he adhered to the United States. If disloyal acts lie ' behind this prima facie proof, it will be for the defendants to establish them.
But if the residence was within the insurrectionary districts, the law will presume two things until the contrary be shown: 1st. That the residence was voluntary; 2d. That the party cooperated with those with whom he chose to live, and became for the time being an enemy of the United States.
To rebut these presumptions a claimant may show: j
1st. That his residence was involuntary. But this is to be evidenced by something more than the inclination of his mind or the utterance of his lips. Where a party giving neither proof of loyal adherence to the United States, nor decisive facts to show that his residence within the insurrectionary districts was a matter beyond his own control, merely offers in evidence a few expressed regrets that he did not leave the' Confederacy when he could, or could not when he would, we cannot admit his declarations as sufficient evidence of the intent. Conversely, where a party actually abandoned his residence to pass through the Confederate lines and place himself within the power and protection of the government; or where, making reasonable and resolute and persistent efforts to pass through, be was turned back, it will go far toward satisfying the court that his residence was always involuntary and enforced.
2d. Failing to show an involuntary residence within the insur *302 rectionary districts, tbe claimant must positively establish bis. loyalty by proving tba-t be never gave aid or comfort to tbe rebellion, and consistently adhered to tbe United States. As. was said in tbe leading case, “ bis evidence to that effect must cover tbe entire period of tbe war, so that it shall appear that be ‘never’ gave aid or comfort to tbe rebellion.” As was also-said, be must prove this £< by those who bad the opportunities of observing bis conduct,” by bis friends, neighbors, and associates, and not by those who could have known little of bis life. It has never been thought by tbe court sufficient fora' claimant to show that in the opinion of any number of witnesses be remained during tbe war a loyal man; nor sufficient for him to establish a loyal reputation; nor to rest upon frequent declarations of fidelity to the government. He ivho has the-difficult task to perforin of proving affirmatively bis own innocence must unfold to tbe court, so far as be can, bis life during the suspected period of the war. He should disclose bis age, bis occupation, tbe places of his residence, the names of bis associates, what be did for tbe one side, and what be refrained from doing for tbe other. His loyal utterances will be admissible as declarations at tbe time made against bis own interest; bis loyal reputation, as evidence of good character. In short, be may and should produce all that will enable his judges to look fully upon bis real life and sentiments.
But tbe law doep not require a party to forestall every objection nor to remove every doubt of tbe defendants’ counsel. When a claimant has made out a good case prima facie ; when be has disclosed bis residence, bis pursuits, bis companions, bis movements; when bebas year by year retraced bis steps during tbe entire period of tbe war, be has given to tbe defendants ample opportunities for refuting him if his case be false. Mere cavils will not then suffice for the defendants. If they do not avail themselves of these opportunities; if they do not employ sufficient means to defend their rights; if they rely upon trivial objections and technical flaws instead of seeking to establish on tbe merits a just defence, then, like other defendants, they must pay tbe penalty of folly. It is not to be supposed tliac a great government comes into a court of justice .craving favors which would not be allowed to any citizen. On tbe contrary, the ■ government, by consenting to be sued, consents to stand upon tbe common ground of all suitors. It *303 must rebut testimony by testimony, and proof by proof, and if it neglects to do this where its opponent has made out a-good case, and seeks to delay or defeat a recovery by other-means, its defence will be frivolous or unconscionable.
Passing' now to the facts of this case, we find that the cotton, of the claimants was captured by a military force of the United States in October, 1863, and in the State of Louisiana. It was-turned over to a Treasury agent at Goodrich Landing, on the-Mississippi; by him shipped to Cincinnati; there sold, and the net proceeds paid into the Treasury, where they remain, a part-of the abandoned or captured property fund. The capture was-made while the cotton was beyond the military lines of the-United States, and while the claimants were absent from the country, but it was in the actual possession of their agent. On these facts we perceive no sufficient reason why the defendants are chargeable with the expenses incurred in the transportation and sale of the cotton, and we know of no statutory authority for awarding to the claimants the gross proceeds of the captured property.
But, on the part of the defendants, it is contended that the claimants’ proof of loyalty is insufficient. From the evidence it appears that both are men of respectability, high stauding, and good character; the one a physician, the other a judge-of the supreme court of Louisiana. In the year 1862, to avoid service in the rebel army, they abandoned their home in Louisiana and made their way to Mexico, where they resided, in Matamoras, until the end of the war. Not much is made against Judge Wylie in this particular, but it is insisted that Dr.. Wylie never was in Mexico. Now, three apparently reputable- and unimpeached witnesses, all subjected to cross-examination, testify that he was.’ The first, a merchant in New Orleans,, says:
“ I am acquainted with the claimants, James G. and William G. Wylie; I knew them before the war; I lived near where they reside in the parish of Carroll. I met them in Mexico. I lyent to Mexico myself to avoid conscription. They remained in Mexico all the time until the end of the rebellion. I saw them every day. I met the claimants very often at the office of the American consul at Matamoras. I met James G. Wylie at Matamoras; he was there when I arrived there. It was-early in 1863 when I arrived there.”
*304 The second witness, an auctioneer in New Orleans, also testifies that be bas known tbe claimants for sixteen years; that be met them in Matamoras in 1863;. that “James G. Wylie remained in Mexico from that time till tbe end of the rebellion,” and that be saw tbe claimants “ there at Matamoras nearly every day.”
Tbe third witness, a merchant in New Orleans, is equally explicit. He knew tbe claimants intimately, and bad lived before tbe rebellion in “ the same parish with them.” He likewise fled to Mexico to avoid conscription, and found them there when be arrived. He also saw them daily, and “ frequently at tbe American consul’s, in Matamoras.”
Tbe testimony of these three witnesses is entirely unshaken by cross-examination. To contradict or impeach them tbe defendants have not called one witness. Tbe sweeping assertion that Dr. James G. Wylie never was in Mexico bas nothing whatever to support it except an apparent discrepancy between tbe foregoing testimony and that of another of tbe claimants’ witnesses.
This last witness was tbe servant of Judge Wylie, who accompanied him to Mexico, and remained with him while be resided there. In tbe record of bis cross-examination there appear these two sentences: “ Claimant James G. Wylie did not go to Mexico with us. I have no personal knowledge where be went to after we left Carroll Parish; be was there when we left.” But tbe witness does not say that be never saw Dr. Wylie in Mexico, and be probably never was asked any such question. Tbe testimony bas been reduced by tbe commissioner to narrative form, yet evidently was drawn out by tbe questioning of á cross-examination. Tbe witness may- have been asked: “Did James G. Wylie go to Mexico with you?” “ Do you know where be did go after you left Carroll Parish ?” “Was he there when you left ?” S ucb questions as these would call out answers truthful and yet apparently conflicting with positive testimony of the other witnesses. Evidently tbe witness was never asked, “Did you ever see tbe claimant, James G. Wylie, in Mexico ?” And until be is, we cannot say that be contradicts tbe other witnesses, or throws discredit upon their clear, explicit, and positive statements. If Dr. James G. Wylie never was in Mexico; if for nearly three years be did not live continuously in Matamoras; if be was not frequently during that *305 period at tbe American consul’s; if all this testimony is fraud and conspiracy, perjury and subornation of perjury, most certainly the defendants could have shown the truth. Imputing such crimes to men upon the mere argument of counsel is not within the ordinary practice of courts of justice.
Among the charges of the Treasury against the captured property is an item of “ 1-J- per cent, to cover incidental expenses.” This charge cannot, be allowed. The statute de-' dares that the owner is entitled to the “ residue” of the proceeds “ after the deduction ” of the defendants’ “ lawful expenses attending the disposition thereof.” The arbitrary deduction of per cent, is not an “expense” incurred by the government.
The judgment of the court is that the claimants recover the net proceeds of seventy-four bales of cotton, amounting in the aggregate to $20,492 81.